## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| MICHAEL CLARK, Individually and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| POKERTEK, INC., LYLE A. BERMAN, JAMES T. CRAWFORD, III, JOSEPH. J. LAHTI, ARTHUR L. LOMAX, GEORGE H. WHITE, MULTIMEDIA GAMES HOLDING COMPANY, INC., MULTIMEDIA GAMES, INC, and 23 ACQUISITION CO., | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff, by and through his attorneys, alleges upon personal knowledge as to himself, and upon information and belief based upon, among other things, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of the public shareholders of PokerTek, Inc. ("PokerTek" or the "Company") against PokerTek and its Board of Directors ("Board" or "Individual Defendants"), to enjoin the proposed transaction announced on April 30, 2014 ("Proposed Transaction") and the shareholder vote scheduled for July 24, 2014, pursuant to which Multimedia Games, Inc., a subsidiary of Multimedia Games Holding Company, Inc. ("MGAM" and collectively with Multimedia Games, Inc., "Multimedia Games") and 23 Acquisition Co. ("Merger Sub"), a wholly-owned subsidiary of Multimedia

1

Games, Inc., will acquire PokerTek.. This action arises out of Defendants' violations of Sections 14 and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and US Securities and Exchange Commission ("SEC") Rule 14 promulgated thereunder ("Rule 14") and Defendants' breaches of their fiduciary duties, and/or aiding and abetting same.

2. On April 30, 2014, PokerTek announced that it has entered into a definitive agreement and plan of merger with Multimedia Games pursuant to which Multimedia Games has agreed to acquire PokerTek at a price of $1.35 per share in cash ("Merger Agreement").

3. The Individual Defendants breached their fiduciary duties by engaging in a flawed sales process wherein they agreed to sell the Company for inadequate consideration.

4. According to Yahoo! Finance, as recently as September 11, 2013, PokerTek shares traded as high as $1.43.

5. The members of the Board breached their fiduciary duties by agreeing to the Proposed Transaction for inadequate consideration following the flawed sales process. As detailed below, given PokerTek's recent strong performance as well as its future growth prospects, the consideration shareholders will receive is inadequate and undervalues the Company.

6. The Individual Defendants exacerbated their breaches of fiduciary duties by agreeing to deal protection provisions in the Merger Agreement that are designed to preclude other bidders from making a successful competing offer for the Company. Specifically, the Individual Defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even continuing discussions and negotiations with potential acquirers; (ii) a provision that provides Multimedia Games with at least five (5) days to match any competing proposal in the event one is made; and (iii) a

2

provision that requires the Company to pay Multimedia Games a termination fee of $650,000 in order to enter into a transaction with a superior bidder. The Board also has agreed to a restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction only under very limited circumstances.

7.      In addition, on April 29, 2014, Lyle A. Berman, James T. Crawford, Joseph J. Lahti, Arthur L. Lomax, Mark D. Roberson, and Gehrig H. White, in each case as a shareholder and/or an option holder of the Company and members of the Company's management and/or members of the Board, entered into a voting agreement with Multimedia Games ("Voting Agreement"), whereby each party to the Voting Agreement agreed to vote all of the shares of common stock of the Company in favor of adoption of the Merger Agreement and in favor of the Merger and against any competing proposals. The shareholders who are parties to the Voting Agreement own approximately 36% of the shares entitled to vote on the Merger.

8.      Additionally, on June 16, 2014, the Defendants (as defined below) filed, or caused to be filed, the Definitive Proxy Statement on Schedule 14A ("Proxy") with the U.S. Securities and Exchange Commission ("SEC"), in order to solicit the respective shareholder votes, in connection with the Proposed Transaction. The Proxy contains numerous material misstatements and omissions concerning, among other things: (a) the sales process and background of the Proposed Transaction; (b) key projections prepared by the Company; and (c) Burrill Securities LLC's ("Burrill") analyses in support of its fairness opinion.

9.      These omissions and misstatements are a violation of Section 14 of the Exchange Act. As set forth in detail below, without the material information, PokerTek's

3

shareholders cannot make an informed decision as to whether or not they should vote in favor of the Proposed Transaction.

10.     For these reasons, and as set forth in detail herein, to remedy Defendants' misconduct, Plaintiff seeks, among other things, injunctive relief preventing consummation of the Proposed Transaction unless and until the Company discloses all material information concerning the Proposed Transaction to its shareholders or, in the event the Proposed Transaction is consummated, recover damages resulting from Defendants' violations of law.

## PARTIES

11.     Plaintiff is, and has been at all relevant times, the owner of shares of common stock of PokerTek.

12.     Defendant PokerTek is a North Carolina corporation with its principal executive offices located at 1150 Crews Road, Suite F, Matthews, North Carolina 28105.

13.     Defendant Lyle A. Berman has been a member of the Board since January 2005 and served as Chairman of the Board from January 2005 until September 2011.

14.     Defendant James T. Crawford, III has served as a member of the Board since its inception in August 2003. Crawford is a co-founder of PokerTek and has served as President and Secretary.

15.     Defendant Joseph. J. Lahti has served on the Board since March 2006 and became Chairman of the Board in September 2011.

16.     Defendant Arthur L. Lomax has served on the Board since its inception in August 2003. From August 2003 to July 2005, he served as PokerTek's Treasurer.

17.     Defendant George H. White has served on the Board since its inception in August 2003 and is a co-founder of the Company. He also served as PokerTek's CEO from August 2003 until September 2008 when he became Vice Chairman of the Board.

18.     The defendants identified in ¶¶ 13-17 are collectively referred to as the "Individual Defendants."

19.     Defendant MGAM is a Texas corporation with its principal executive offices located at 206 Wild Baskin Road South, Bldg. B, Austin, Texas 78746. Through its wholly owned subsidiary, Multimedia Games, Inc., MGAM develops and distributes gaming technology. The company is a creator and supplier of comprehensive systems, content and electronic gaming units for Native American and commercial casinos. Revenue is derived from gaming units in operation on revenue-sharing arrangements as well as from the sale of gaming units and systems that feature proprietary game content and game themes licensed from others. MGAM also supplies the central determinant system for the video lottery terminals ("VLTs") installed at racetracks in the State of New York. The company is focused on pursuing market expansion and new product development for commercial and tribal casinos and VLT markets.

20.     Defendant Multimedia Games, Inc. is a Delaware corporation with its principal executive offices located at 206 Wild Baskin Road South, Bldg. B, Austin, Texas 78746 and is a wholly owned subsidiary of Multimedia Games Holding Company, Inc.

21.     Defendant Merger Sub is a North Carolina corporation and a direct, wholly owned subsidiary of Multimedia Games.

22.     The Individual Defendants, together with MGAM, Multimedia Games, Inc., and Merger Sub are referred to herein as "Defendants."

5

## JURISDICTION AND VENUE

23.     Jurisdiction is founded upon federal question jurisdiction, pursuant to § 27 of the Exchange Act, as amended, 15 U.S.C. § 78aa. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

24.     Venue is proper under 28 U.S.C. §1391(b)(2) because PokerTek maintains offices in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District. Moreover, each of the Individual Defendants as Company officers and/or directors has extensive contacts within this District.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action on his own behalf and as a class action pursuant to Fed. R. Civ. P. 23 on behalf of all holders of PokerTek who are being and will be harmed by Defendants' actions described herein ("Class"). Excluded from the Class are the Defendants herein, and any person, firm, trust, corporation or other entity related to or affiliated with the Defendant.

26.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable. According to the Proxy, as of May 23, 2014, there are an aggregate of 9,993,065 shares of PokerTek common stock, including the following: (i) 9,915,865 shares of PokerTek common stock outstanding; and (ii) 77,200 shares of PokerTek common stock issuable upon exercise of outstanding stock options. The actual number of class members will be ascertained through discovery.

b.     There are questions of law and fact that are common to the Class, including:

i)     whether Defendants failed to disclose material information in

6

connection with the Proposed Transaction;

ii)    whether Defendants violated their fiduciary duties and/or aided and abetted violations of same; and

iii)    whether Plaintiff and the other members of the Class would suffer irreparable injury if the alleged omissions are not corrected before the shareholder vote on the Proposed Transaction.

c.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

d.    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

e.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

f.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### I.    BACKGROUND

27.    PokerTek is a North Carolina corporation headquartered in Matthews, NC. The Company designs, manufactures and markets electronic table games and related products for casinos, cruise lines, racinos, card clubs and lotteries worldwide. PokerTek distributes its

7

electronic table games using an internal sales force, complemented by distributors and sales agents in select geographic areas, generally on a recurring revenue participation model, recurring revenue fixed license fee model or as a sale of hardware combined with recurring license and support fees.

28. On March 12, 2014, PokerTek issued a press release announcing its financial results for its fourth quarter and full year 2013. Highlights for the quarter included:

- Total revenue increased 5%
- Gross profit margin exceeds 60%
- Net loss from continuing operations improved 35%

Highlights for the full year 2013 included:

- Total revenue increased 7%
- Recurring revenue increased 11%
- Gross profit margin exceeds 70%
- Net loss from continuing operations improved 25%
- Net cash used in operating activities improved 84%
- EBITDAS positive for third consecutive year

29. The Company reported that its total revenue increased 7.1% to $5.5 million for the year ended December 31, 2013, with revenues from license and service fees increasing 11.1%. For the quarterly periods, total revenue increased 4.8% with revenue from sales of systems and equipment increasing 324.3%. Gross profit was $4.0 million for year ended December 31, 2013 compared to $3.8 million for the year ended December 31, 2012, an increase of 6.9%.

30. In connection with the March 12, 2014 release, Mark Roberson, PokerTek CEO, commented as follows:

8

"Financially, 2013 was a solid year posting recurring revenue growth, strong gross margins and significant improvements in net operating results and cash flow. Our operations and technical teams deserve tremendous credit for the turnaround in our financial performance in recent years. We also achieved several important marketing and product development milestones during the year, entering new gaming markets in Macau and South America, growing our cruise ship penetration, achieving regulatory approvals for our ProCore product line, and initiating our expansion into mobile gaming."

## II.  THE PROPOSED TRANSACTION

31.     On April 30, 2014, PokerTek issued a press release announcing the Proposed Transaction:

PokerTek, Inc. (Nasdaq: PTEK) ("PokerTek") announced today that it has entered into a definitive agreement and plan of merger with Multimedia Games, Inc., a subsidiary of Multimedia Games Holding Company, Inc. (Nasdaq: MGAM) (together, "Multimedia Games"), pursuant to which Multimedia Games has agreed to acquire PokerTek at a price of $1.35 per share in cash.

Completion of the transaction is subject to the approval by holders of a majority of the Company's common shares, the receipt of certain gaming approvals, and other customary closing conditions. PokerTek's Board of Directors unanimously approved the merger agreement with Multimedia Games and has recommended that the Company's shareholders adopt the merger agreement. Assuming the satisfaction of conditions, the transaction is expected to close in calendar 2014.

Mark Roberson, PokerTek's Chief Executive Officer, stated, "Combining with Multimedia Games provides our shareholders with the opportunity to receive a healthy premium for their shares and is an ideal situation for our customers, employees and other commercial partners. PokerTek and Multimedia Games share a similar operating philosophy and culture, focusing on superior customer service and delivering products that generate strong returns for casino operators. As part of the Multimedia Games organization, we believe further development of innovative products and solutions will address the growing demand for eTables from casino customers and players worldwide."

Pat Ramsey, Chief Executive Officer of Multimedia Games, added, "With eTable growth accelerating in domestic and international casinos, acquiring PokerTek represents an excellent opportunity to expand our product portfolio. We believe the PokerPro product is an excellent complement to our

9

existing business and that we can expand the penetration of PokerPro in North America by leveraging our strong domestic manufacturing, sales and service capabilities. Further, with a growing installed base of gaming positions internationally, this transaction represents a solid entry point to further diversify our revenue and geographic base. This transaction reflects Multimedia Games' strategic emphasis on offering leading products that resonate with our customers' players and increasing our share of the casino gaming floor."

Joe Lahti, Chairman of the Board of Directors of PokerTek added, "The team at PokerTek has done an outstanding job over the past several years turning the company around financially, building a dominant market position and cultivating strong customer relationships. Merging with Multimedia Games is a positive event for our shareholders and marks the beginning of an exciting new chapter for PokerTek."

***Transaction Details***

Completion of the transaction is subject to the approval by holders of a majority of the Company's common shares, the receipt of certain gaming approvals, and other customary closing conditions (which is not conditioned on financing). Assuming the satisfaction of conditions, the transaction is expected to close in calendar 2014.

Burrill Securities acted as financial advisor, and Morse, Zelnick, Rose & Lander, LLP acted as legal advisor, to the Company.

32.     Pursuant to the terms of the Merger Agreement, Multimedia Games will acquire PokerTek in an all-cash transaction wherein PokerTek shareholders will receive $1.35 per share.

33.     The Individual Defendants breached their fiduciary duties by engaging in a flawed sales process wherein they agreed to sell the Company for inadequate consideration.

34.     According to Yahoo! Finance, as recently as September 11, 2013, PokerTek shares traded as high as $1.43.

35.     Given the Company's recent strong performance and its positioning for growth, the consideration offered in the Proposed Transaction is inadequate and significantly undervalues the Company.

10

36.     In consideration of the foregoing, the Proposed Transaction offers wholly inadequate consideration to the Company's shareholders.

## III.     THE PRECLUSIVE DEAL PROTECTION DEVICES

37.     As part of the Merger Agreement, the Individual Defendants agreed to certain onerous and unreasonable deal protection devices that operate conjunctively to preclude competing offers for the Company from emerging.

38.     Section 5.5(a) of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by Multimedia Games. Further, Section 5.5(d) of the Merger Agreement requires that the Company terminate any prior or ongoing discussions with other potential acquirers, and Section 5.4(c) provides that PokerTek may not waive any confidentiality or standstill agreements entered into with other parties.

39.     The Merger Agreement also contains an "information rights" and a "matching rights" provision, whereby the Company must promptly notify Multimedia Games should it receive an unsolicited competing acquisition proposal and grant Multimedia Games a chance to match the offer before the Board may change its recommendation in favor of the Proposed Transaction. Pursuant to Section 5.5(c) of the Merger Agreement, the Company must notify Multimedia Games of the bidder's identity and the terms of the bidder's offer, and copies of all correspondence and written materials provided to the bidder. Thereafter, if the Board determines that the competing acquisition proposal constitutes a Superior Offer (as defined in the Merger Agreement), Section 5.5(b) requires the Board to grant Multimedia Games five calendar days to amend the terms of the Merger Agreement so that the competing proposal no longer constitutes a superior offer. Moreover, should the competing Superior Offer be

11

revised or modified in any material respect, Section 5.5(b) requires PokerTek to provide Multimedia Games a new notice and an additional five day period.

40.     Pursuant to Section 5.5(b) of the Merger Agreement, the Board cannot change its recommendation or terminate the Merger Agreement even if it determines that another acquisition proposal is superior until at least five calendar days after Multimedia Games receives written notice from PokerTek confirming that the other acquisition proposal is superior. Any material revision or modification of the acquisition proposal would restart the clock.

41.     Section 7.2 of the Merger Agreement also provides that PokerTek must pay a termination fee of $650,000 to Multimedia Games if the Company decides to pursue the competing offer. The substantial termination fee will ensure that no competing offer will appear, as any competing bidder would essentially pay a premium for the right to provide the shareholders with a superior offer.

42.     In addition, on April 29, 2014, Lyle A. Berman, James T. Crawford, Joseph J. Lahti, Arthur L. Lomax, Mark D. Roberson, and Gehrig H. White, in each case as a shareholder and/or an option holder of the Company and members of the Company's management and/or members of the Board, entered into the Voting Agreement, whereby each party to the Voting Agreement agreed to vote all of the shares of common stock of the Company owned beneficially (or of record) by such shareholder, including, but not limited to, any shares of common stock of the Company that such voting shareholder has the right to vote due to any agreement, proxy or other similar right (i) in favor of adoption of the Merger Agreement and in favor of the Merger, (ii) against (a) any proposal made in opposition to adoption of the Merger Agreement or in competition or inconsistent with the Merger or any

12

other transaction contemplated by the Merger Agreement, (b) any Company Takeover Proposal (as defined in the Merger Agreement), including a Superior Proposal, (c) any change in the management or the Board of the Company (other than as contemplated by the Merger Agreement), (d) any sale or transfer of a material amount of the assets or capital stock of the Company or any of its subsidiaries, (e) any action, matter, agreement or proposal submitted to shareholders of the Company for approval, if it could reasonably be expected that, or if such shareholder has actual knowledge that the approval of such action, matter, agreement or proposal would result in a breach of any representation, warranty, covenant or agreement or any other obligation of the Company under the Merger Agreement, and (f) any action, proposal, transaction or agreement that is intended or could reasonably be expected to impede, interfere with, delay, discourage, inhibit, postpone, or adversely affect the Merger or the other transactions contemplated by the Merger Agreement.

43.     The shareholders who are parties to the Voting Agreement own approximately 36% of the shares entitled to vote on the Merger.

44.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## IV.     THE INDIVIDUAL DEFENDANTS' SELF-DEALING

45.     Compounding their breach of their fiduciary duties, the Board negotiated self-serving terms in the Merger Agreement that provide them and other insiders with unique, unearned benefits at the expense of PokerTek's shareholders. Pursuant to the Merger Agreement, each outstanding option to purchase shares of PokerTek Common Stock that is outstanding and unexercised as of immediately prior to the effective time of the Merger,

13

whether vested or unvested, will automatically vest and be converted into the right to receive a cash payment equal to the number of shares of PokerTek Common Stock subject to such option multiplied by the amount (if any) by which $1.35 exceeds the exercise price per share of such option, less any applicable withholding taxes.

46.     In addition, Mark. Roberson, (PokerTek CEO), owns restricted stock units, ("RSUs"), with respect to 300,000 shares of PokerTek common stock. Pursuant to the terms of the RSU grant agreement, each share covered by the RSU will immediately vest and be settled upon the later of shareholder approval of the Merger Agreement and the receipt of all requisite regulatory approvals necessary to consummate the Merger. As a result, the shares of common stock underlying the RSUs will be treated as issued and outstanding shares of PokerTek common stock upon the closing of the Merger, and will entitle Mr. Roberson to the $1.35 per share merger consideration. As a result, Mr. Roberson will receive $405,000 with respect to outstanding RSUs, less any applicable tax withholding.

47.     The following table sets forth, as of May 23, 2014, the equity compensation award holdings of PokerTek's directors and executive officers and the gross value of such holdings assuming the Merger is completed:

| Holder | Number of Shares Subject to Vested Stock Options | Cash Consideration to be Received for Vested Stock Options | Number of Shares Subject to Unvested Stock Options | Cash Consideration to be Received for Unvested Stock Options | Number of Shares Subject to RSUs | Cash Consideration to be Received for RSUs | Cash Consideration to be Received for All Stock Options and RSUs |
|---|---|---|---|---|---|---|---|
| Mark D. Roberson | 191,000 | $ 3,333 | 0 | 0 | 300,000 | $ 405,000 | $ 408,333 |
| James T. Crawford, III | 125,000 | 3,333 | 0 | 0 | 0 | 0 | 3,333 |
| Gehrig H. White | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Joseph J. Lahti | 20,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| Lyle Berman | 80,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arthur L. Lomax | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

48.    In addition, PokerTek's existing employment agreements with each of Mark D. Roberson, James T. Crawford and Gehrig H. White, its CEO, President and Vice Chairman, respectively, provide that, in the event of a change of control, which the closing of the Merger will constitute, Messrs. Roberson, Crawford and White will receive a cash payment in the amount of $185,000, $100,000 and $100,000, respectively, payable in a lump sum if the respective executive's employment is terminated following the closing of the Merger, or otherwise in 12 equal monthly installment. As of the issuance of the Proxy, no employment agreements have been entered into in connection with the Merger and no prospective employment terms have been presented.

49.    As demonstrated above, many of the officers involved in the negotiation of the Proposed Transaction stand to reap substantial amounts of money as a result of the Proposed Transaction, benefits not shared with the Company's public shareholders and at their expense.

## V.    THE PROXY OMITS MATERIAL INFORMATION

50.    On June 16, 2014, Defendants filed, or caused to be filed, the Proxy with the SEC, in connection with the Proposed Transaction. The Proxy contains numerous material misstatements and omissions concerning, among other things: (a) the sales process and background of the Proposed Transaction; (b) key projections prepared by the Company; and (c) Burrill's analyses in support of its fairness opinion.

### *Material Omissions Regarding the Background of the Proposed Transaction*

51.    The Proxy fails to provide shareholders with material information concerning the process leading up to the Proposed Transaction. In particular, the Proxy fails to disclose:

(a)    The details, timing, progress, and outcomes of the market analysis and strategic options identified by the Company's bankers and discussed at the September 25, 2102 meeting;

(b)    When the Board determined to resume its evaluation of strategic alternatives, which it suspended on October 24, 2012, and whether the decision to resume was made before Lahi met with the CEO of MGAM on April 22, 2013;

(c)    The number, nature, and composition of the "other specified parties" with whom PokerTek sought to explore potential business combinations with the assistance of the unidentified investment bank on May 7, 2013;

(d)    The details of the potential valuation contemplated and discussed on October 2, 2013 with MGAM;

(e)    The details of the potential valuation contemplated and discussed on October 8, 2013 with MGAM;

16

(f)     The potential valuation and premium discussed with MGAM on January 15, 2014; and

(g)     Who proposed the employment arrangements that were a condition to closing as of April 15, 2014; the terms of those arrangements; and when they were proposed.

### *Material Omissions Regarding PokerTek's Management's Projections (pg. 44)*

52.     The Proxy fails to disclose key financial projections prepared by PokerTek management and relied upon by Burrill in its financial analysis and in rendering its fairness opinion in support of the Proposed Transaction.

53.     As disclosed in the Proxy, in connection with rendering its opinion, Burrill reviewed the forecasted potential future cash flows of PokerTek. Specifically, when performing its *Discounted Cash Flow Analysis*, Burrill calculated a range of implied price per share based upon the discounted net present value of the sum of the projected stream of unlevered free cash flows for the years ending December 31, 2014 to December 31, 2019 and a projected terminal value at December 31, 2019. However, the Proxy fails to disclose the projected stream of unlevered free cash flows for the years ending December 31, 2014 to December 31, 2019 or the projected terminal value at December 31, 2019.

### *Material Omissions Concerning Burrill's Analyses*

54.     The Proxy also fails to disclose certain data and inputs underlying the financial analysis supporting the fairness opinion of the Board's financial advisor, Burrill.

#### *Implied Transaction Multiples (pg. 42)*

55.     With respect to Burrill's *Implied Transaction Multiples* calculation, which was incorporated into Burrill's *Comparable Companies Analysis* and *Comparable*

*Transactions Analysis*, the Proxy fails to disclose the following figures for PokerTek which Burrill utilized for calculating the various multiples:

a. Enterprise Value;
b. LTM Revenue;
c. 2014E Revenue;
d. LTM EBIDTA; and
e. 2014E EBITDA.

### Comparable Companies Analysis (pgs. 42 – 43)

56. With respect to Burrill's *Comparable Companies Analysis*, for each of the companies analyzed, the Proxy fails to disclose their respective:

a. Enterprise Value;
b. LTM Revenue;
c. 2014E Revenue;
d. LTM EBIDTA; and
e. 2014E EBITDA.

57. For each of the respective companies analyzed, the Proxy also fails to disclose their respective multiples for:

a. EV to LTM Revenue;
b. EV to 2014E Revenue;
c. EV to LTM EBIDTA;
d. EV to 2014E EBITDA; and
e. Price to Book Value.

58. In addition, the Proxy fails to disclose whether Burrill performed any type of benchmarking analysis for PokerTek in relation to the selected comparable companies; the mean multiples observed; why Burrill relied upon the median and appeared to disregard the mean; and how Burrill derived a range for the implied value per share of PokerTek common stock of $0.35–$2.03.

18

*Comparable Transactions Analysis (pgs. 42 – 43)*

59.      With respect to Burrill's Comparable Transactions Analysis, for each of the companies involved in the analyzed transactions, the Proxy fails to disclose their respective:

     a.  Enterprise Value;
     b.  LTM Revenue;
     c.  LTM EBIDTA; and
     d.  Price to Book Value.

60.      In addition, for each of the analyzed transactions, the Proxy fails to disclose the respective multiples for:

     a.  EV to LTM Revenue;
     b.  EV to LTM EBIDTA; and
     c.  Price to Book Value.

61.      In addition, the Proxy fails to disclose how Burrill selected the transactions incorporated into its analysis; the mean multiples observed; why Burrill relied upon the median as opposed to the mean; and how Burrill derived a range for the implied value per share of PokerTek common stock of $0.40–$1.19.

*Premiums Paid Analysis (pg. 44)*

62.      With respect to Burrill's Premiums Paid Analysis, for each of the analyzed transactions, the Proxy fails to disclose  the observed premiums based on:

     a.  the closing stock price of the target one day prior to announcement of the transaction;
     b.  the closing stock price of the target seven days prior to announcement of the transaction; and
     c.  the closing stock price of the target thirty days prior to announcement of the transaction.

63.      In addition, the Proxy fails to disclose the mean premiums observed or why Burrill relied upon the median and appeared to disregard the mean.

19

*Discounted Cash Flow Analyses (pg. 44)*

64.     With respect to Burrill's Discounted Cash Flow, the Proxy fails to disclose:

    a.   the projected unlevered cash flows;
    b.   whether Burrill adjusted management's projections for the analysis;
    c.   the net present value of the Company;
    d.   the implied terminal EBITDA multiples derived by Burrill;
    e.   how Burrill derived the implied valuation range of $0.98-$1.47; and
    f.   how stock based compensation was treated in the analysis (ie. cash or non-cash).

65.     Without the omitted information identified above, PokerTek's public shareholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes shareholder value and serves their interests. Moreover, without the key financial information and related disclosures, PokerTek's public shareholders cannot gauge the accuracy and reliability of the financial analyses performed by Burrill and whether they can reasonably rely on its fairness opinion in determining how to vote on the Proposed Transaction.

66.     Accordingly, Plaintiff seeks the following relief on his claims related to the inadequate consideration obtained, the process pursued, and the omissions/misstatements of material information in connection with the Proposed Transaction, including: (i) enjoinment of the Proposed Transaction; or (ii) rescission of the Proposed Transaction in the event that it is consummated and to recover damages resulting from the Individual Defendants' violations of their fiduciary duties and from Multimedia.

## FIRST CAUSE OF ACTION
### (Brought Individually for Violation of §14 of the Exchange Act)

67.     Plaintiff repeats and realleges each allegation set forth herein.

68.     PokerTek has caused the Proxy to be issued with material omissions and misleading statements.

69. The Proxy is an essential link in the accomplishment of the Proposed Transaction.

70. In the exercise of reasonable care, PokerTek should have known that the Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

71. The misrepresentations and omissions in the Proxy are material to Plaintiff, and Plaintiff will be deprived of his right to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the vote by shareholders.

**SECOND CAUSE OF ACTION**
**(Brought Individually Against the Individual Defendants for Violation of §20 of the Exchange Act)**

72. Plaintiff repeats and realleges each allegation set forth herein.

73. The Individual Defendants acted as controlling persons of PokerTek within the meaning of §20 of the Exchange Act as alleged herein. By virtue of their positions as officers or directors of PokerTek, and participation in, or awareness of, the Company's operations, or intimate knowledge of the false and misleading statements contained in the Proxy filed by in connection with the Proposed Transaction, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading.

74. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to, or shortly after, these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

75.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the Proposed Transaction giving rise to the securities violations as alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the making of the Proxy.

76.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that they reviewed and considered and which had input from the Board.

77.     Moreover, the Individual Defendants each have the duty individually to discover and correct any material misstatement or omission of material fact, which they have failed to do.

78.     By virtue of the foregoing, the Individual Defendants have violated §20 of the Exchange Act.

79.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated §14 and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to § 20 of the Exchange Act. As a direct and proximate result of the Individual Defendants' conduct, Plaintiff will be irreparably harmed.

### THIRD CAUSE OF ACTION
### (Against the Individual Defendants for Breach of Fiduciary Duties)

80.     Plaintiff repeats and realleges each allegation set forth herein.

22

81. The Individual Defendants have violated fiduciary duties owed to public shareholders of PokerTek.

82. By the acts, transactions and courses of conduct alleged herein, the Individual Defendants have failed to obtain for PokerTek's public shareholders the highest value available for PokerTek in the marketplace.

83. As demonstrated by the allegations above, the Individual Defendants breached their fiduciary duties owed to the shareholders of PokerTek because they failed to take steps to maximize the value of PokerTek to its public shareholders in a change of control transaction.

84. As a result of the actions of defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive the highest available value for their equity interest in PokerTek. Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the members of the Class.

85. Plaintiff and the members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from immediate and irreparable injury, which the Individual Defendants' actions threaten to inflict.

### FOURTH CAUSE OF ACTION
### (Against MGAM, Multimedia Games, Inc., and Merger Sub for Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty

86. Plaintiff repeats and realleges each allegation set forth herein.

87. MGAM, Multimedia Games, Inc., and Merger Sub have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are

in breach of their fiduciary duties to PokerTek's public shareholders, and have participated in such breaches of fiduciary duties.

88.     MGAM, Multimedia Games, Inc., and Merger Sub knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.   In so doing, MGAM, Multimedia Games, Inc., and Merger Sub rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Transaction in breach of their fiduciary duties.

89.     Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands relief in his favor and against Defendants as follows:

A.     Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as Class representative;

B.     Enjoining the shareholder vote on the Proposed Transaction, unless and until the Company discloses all material information to shareholders in connection with the Proposed Transaction;

C.     Enjoining Defendants, its agents, counsel, employees and all persons acting in concert with it from consummating the Proposed Transaction, unless and until the Company discloses all material information to shareholders in connection with the Proposed Transaction;

D.     Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff rescissory damages;

E.     Directing the Defendants to account to Plaintiff for all damages suffered as a

24

result of the wrongdoing;

F.      Declaring that the Proxy is materially misleading and contains omissions of material fact in violation of Section 14 of the Exchange Act and Rule 14 promulgated thereunder;

G.      Awarding compensatory damages in favor of Plaintiff against Defendants for all losses and damages suffered as a result of Defendants' wrongdoing alleged herein, in an amount to be determined at trial, together with interest thereon;

H.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

I.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a jury on all issues triable before a jury.

Dated: July 10, 2014

s/S. Ranchor Harris, III_____

S. Ranchor Harris III
7960 Sumter Ridge Lane #4112
Raleigh, North Carolina 27617
Telephone:336-500-1834
ranchorharris@gmail.com
NCSB # 21022

25

Of Counsel:

Brower Piven, A Professional Corporation
Brian C. Kerr
475 Park Avenue South, 33rd Floor
New York, NY 10016
Tel.: 212-501-9000
Fax: 212-501-0300
kerr@browerpiven.com